## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

Tawana Henderson,

       Plaintiff,

v.

City of Woodbury, *et al.*,

       Defendants.

Civ. No. 15-3332 (RHK/FLN)
**MEMORANDUM OPINION
AND ORDER**

J. Ashwin Madia, Joshua A. Newville, Madia Law LLC, Christopher J. Kuhlman, Kuhlman Law PLLC, Minneapolis, Minnesota, for Plaintiff.

Joseph E. Flynn, Patrick S. Collins, Robert I. Yount, Vicki A. Hruby, Jardine Logan & O'Brien PLLP, Lake Elmo, Minnesota, for Defendants.

### INTRODUCTION

On August 31, 2012, Defendants Anthony Ofsted, Natalie Bauer,[1] and Stacy Krech, three Woodbury, Minnesota, police officers, responded to an emergency call and ultimately shot and killed Mark Henderson. Tawana Henderson, Mark's mother and trustee for his next of kin, later commenced this action against the officers and the City of Woodbury ("Woodbury"), alleging the use of deadly force was excessive in violation of the Fourth Amendment. Presently before the Court is Defendants' Motion for Summary Judgment. For the reasons that follow, their Motion will be granted.

---

[1] Bauer was formerly known (and has been sued) as Natalie Martin.

## BACKGROUND

The record reveals the following facts, presented in a light most favorable to

Tawana.  Shortly after midnight on August 31, 2012, Mark and several others rode to the

Red Roof Inn (the "Inn") in Woodbury in a vehicle driven by Demetrius Ballinger.  The

group planned to attend a party at the Inn, and Ballinger intended to drop the group off

and leave.  But, upon arrival, Ballinger's car overheated, so he followed the group inside.

(Madia Decl Ex. CC at 1610.)  Then, for reasons unknown, he drew a handgun, robbed

Mark and the others, and held them hostage.  One hostage dialed 911, but she was forced

to hide her phone from Ballinger, so she was unable to speak to dispatchers.  (T.M.S.

Dep. 27–29.)

At 1:09 a.m., Woodbury emergency dispatch received the hostage's "open-line"

call.  The dispatcher heard garbled male and female voices and an argument over a knife,

but no one spoke directly to the dispatcher.  Dispatch sent police officers to respond,

advising of a

> 911 open-line 1818 Wooddale Drive.  Can hear two males talking about a
> knife—it sounds like one possibly took it from the other and he's trying to
> get it back.  Map to an uncertain 32 meters from that location.  It's possibly
> going to be the Red Roof.

(Hruby Aff. Ex. T.)

Bauer and Krech responded to the Inn and began searching for the source of the

call.[2]  In full police uniforms, they walked around the outside of the building, peered in

---

[2] The Inn is a two-story rectangular building.  The first-floor rooms exit directly outdoors, and
the second-floor rooms exit onto a narrow balcony that borders the building.  A hallway with a
staircase, referred to by the parties as a breezeway, runs through the middle of the building.

windows, and listened for a disturbance.  They eventually came upon Room 217[3] where, through a gap in the curtains, Krech spotted an "animated black male" wearing a dark shirt and jumping up and down.  (Krech Dep. 25–27.)  She moved away and signaled to Bauer, who looked in and saw a tall black male wearing a "forest green" shirt standing near the window.  (Bauer Dep. 12.)  Almost immediately, this man, later identified as Ballinger, pointed a black handgun at Bauer's head.  (Id. 13–14; Krech Dep. 28.)  She ducked, drew her firearm, and shouted "Gun!"  (Bauer Dep. 14–15.)  She and Krech then moved away from the window.  (Id.)  They commanded "police department, come out with your hands up," but, lacking cover, halted their commands and retreated to the breezeway, where they radioed for backup.  (Krech Dep. 31–33.)  At that point, they "didn't know anything about this person[,] what was going on in the room," or how many people were in the room.  (Id.)

     Ofsted, who was nearby, heard the call for assistance and responded.  (Ofsted Dep. 12–15.)  He found Krech and Bauer in the breezeway with their firearms drawn; they advised him that a black male in Room 217 had pointed a handgun at Bauer's head.  Sergeant Murray arrived shortly thereafter, and Bauer began briefing him on the situation.  (Id. 15–16; Bauer Dep. 18.)  The decision to call a SWAT team was made.  (Ofsted Dep. 20.)[4]

---

[3] Room 217 is on the second floor and is the third room west of the breezeway.

[4] The officers were unable to recall the timing of these events.  (See e.g., Ofsted Dep. 17 ("no clue" how long he was on the scene before Murray arrived); id. 20 (unable to recall how long he had been on the scene prior to decision to call SWAT); Bauer Dep. 18 ("I can't tell you" how

Then, without warning, the officers heard a gunshot.  Simultaneously, the door to

Room 217 opened.  (Ofsted Dep. 21; Bauer Dep. 20; Krech Dep. 47.)  A black male

wearing a white shirt, later identified as Mark, burst from the room and ran directly

toward the officers.  (Ofsted Dep. 24, 30 (Mark was "sprinting" towards them); Krech

Dep. 40 (Mark was "just barreling at [them] . . . running at [them] very determined").)  A

witness heard Mark shout "don't" as he left Room 217.  (D.M. Dep. 35–37.)  Krech and

Ofsted immediately began yelling commands: Krech ordered Mark to "get on the

ground" several times.  (Krech Dep. 53.)  Ofsted yelled "drop the gun on the ground,"

and "Police! Get down!"  (Ofsted Dep. 26–27.)  Both officers testified Mark failed to

comply and kept running towards them, and they believed he had just shot at them.  (Id.

28, 75; Krech Dep. 54–55, 87.)  They opened fire within seconds of his exit from Room

217.  (Ofsted Dep. 27; Krech Dep. 56.)

Mark continued toward the breezeway undeterred by the officers' gunfire.  At this

point, Bauer, who had been briefing Murray with her back to Krech and Ofsted, turned to

find Mark running at her.  (Bauer Dep. 23–24.)  He reached the breezeway, where he

moved "deliberately" to a face-down position perpendicular to the officers.  (Id. 29–33;

Ofsted Dep. 32.)  The officers ordered him to show his hands and yelled additional

commands, but he failed to comply.  (Ofsted Dep. 35–38.)  Instead, he pushed himself up

with his left hand, and his right hand was obscured beneath his torso.  To the officers, it

appeared he was attempting to roll onto his right side.  Ofsted directed Mark to "stop or

---

long after seeing the gun Ofsted or Murray arrived); id. 20 (unable to recall how long she was in
the breezeway prior to gunshot).)

I'm going to shoot," but Mark did not stop moving; instead, he moved his right arm with his hand obscured. (Id. 70–71; Krech Dep. 59.) The officers testified that they were concerned his right hand held a weapon (e.g., Krech Dep. 66), so they fired again until Mark made his right hand visible above his head. (Id. 61, 92–93; Ofsted Dep. 37–39.) When asked in her deposition why she shot Mark, Bauer explained:

> It was the totality of everything that had happened. It wasn't one single thing . . . I hear a gunshot, a man runs down the hallway—runs at us . . . and he continued as . . . I was yelling 'show me your hands.' He just continued to turn towards us, and I couldn't see his right hand, and I had already had a gun in my face, and it was all those things put together. That's why I fired . . . I thought he was trying to kill us.

(Bauer Dep. 38.) Krech and Ofsted testified similarly. (E.g., Ofsted Dep. 82–83; Krech Dep. 91–92.) In all, the officers fired seventeen rounds in a short period. (Id. 37 ("The whole thing happened so fast.").)

Only after the officers stopped firing did Bauer realize that Mark was not the man who had aimed a gun at her from inside Room 217. (Id. 62.) Ofsted called an ambulance (Ofsted Dep. 44), which took Mark to Regions Hospital in St. Paul, Minnesota, but he died from his injuries (Hruby Aff. Ex. U). An autopsy revealed that he had suffered thirteen gunshot wounds prior to his death. (Id.)

The officers testified they believed Mark shot *at them* as he ran from the room. (Krech Dep. 56, 64; Bauer Dep. 22; Ofsted Dep. 75.) Krech was worried Mark held a gun in his right hand (Krech Dep. 66), and Bauer believed he was armed, but did not see a gun (Bauer Dep. 32–33). Ofsted initially testified he saw Mark with a gun, but later testified he did not. (Ofsted Dep. 28, 75.) Either way, it is undisputed that Mark was, in

fact, unarmed.  An investigation by the Minnesota Bureau of Criminal Apprehension

revealed that Ballinger—not Mark—had fired the shot officers heard as Mark fled from

Room 217.[5]  (Hruby Aff. Ex. N.)

On August 15, 2015, Tawana commenced this action under 42 U.S.C. § 1983

against the City of Woodbury, and against Krech, Ofsted, and Bauer in their individual

capacities,[6] alleging that the officers' use of deadly force was excessive.  She also alleged

state-law claims for wrongful death and vicarious liability.  Defendants have now moved

for summary judgment.  The Motion has been fully briefed and the Court heard argument

on December 22, 2016.  The Motion is ripe for disposition.

**STANDARD OF DECISION**

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue of material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

477 U.S. 317, 322–23 (1986).  The moving party bears the burden of showing that the

material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573

F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that

---

[5] Unfortunately, the events in Room 217 did not end with Mark's attempted escape.  Ballinger was eventually found guilty of attempted second-degree murder and four counts of first-degree criminal sexual conduct.  He is currently serving a thirty-six year prison sentence.  E.g., Avery Crop, Ballinger sentenced in Red Roof Inn shooting, rapes, Stillwater Gazette (Oct. 9, 2013), http://stillwatergazette.com/2013/10/09/ballinger-sentenced-red-roof-inn-shooting-rapes.

[6] The Complaint's caption named the officers in their individual *and official* capacities, but Tawana alleged only that the "defendant officers, in their *individual* capacity [sic], violated decedent [Mark]'s Fourth Amendment rights by using excessive force."  (Compl. ¶ 14 (emphasis added).)  As Tawana has not alleged the officers are liable in their official capacities, the Court's analysis is limited to her individual-capacity claims.

may be reasonably drawn from it, in the light most favorable to the nonmoving party.

Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v.

Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible

evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528

F.3d 1074, 1078–79 (8th Cir. 2008).

## ANALYSIS

### I.    Excessive force

Tawana alleges the officers violated Mark's rights under the Fourth Amendment

by employing deadly force.  In response, the officers invoke qualified immunity.

"Qualified immunity shields [a] government official[] from liability . . . unless the

official's conduct violates a clearly established constitutional . . . right of which a

reasonable person would have known."  LaCross v. City of Duluth, 713 F.3d 1155, 1157

(8th Cir. 2013).  In this context, the doctrine "protects officers from the sometimes 'hazy

border between excessive and acceptable force.'"  Saucier v. Katz, 533 U.S. 194, 206

(2001) (internal citations omitted).  Indeed, "[o]fficers are not liable for bad guesses in

gray areas; they are liable for transgressing bright lines."  Luckert v. Dodge Cty., 684

F.3d 808, 817 (8th Cir. 2012) (citation omitted).  The qualified-immunity analysis

requires the Court to answer two questions:  Does the evidence, viewed in the light most

favorable to Tawana, show the officers violated Mark's constitutional rights?  Keil v.

Triveline, 661 F.3d 981, 985 (8th Cir. 2011) (citing Pearson v. Callahan, 555 U.S. 223,

232 (2009)).  If so, were those rights clearly established on the date in question?  Id.

To determine whether the officers' use of force violated Mark's Fourth

Amendment rights, the Court asks whether it was reasonable under the totality of

circumstances known to the officers.  Copeland v. Locke, 613 F.3d 875, 881 (8th Cir.

2010) (citations omitted).  Factors bearing on this question include "the severity of the

crime at issue, whether [Mark] pose[d] an immediate threat to the safety of the officers or

others, and whether he [wa]s actively resisting arrest or attempting to evade arrest by

flight."  Wertish v. Krueger, 433 F.3d 1062, 1066 (8th Cir. 2006) (quoting Graham v.

Connor, 490 U.S. 386, 396 (1989)).  The use of deadly force is reasonable if the officers

had probable cause to believe Mark posed a threat of serious physical harm or death.

Loch v. City of Litchfield, 689 F.3d 961, 965 (8th Cir. 2012) (citing Tennessee v. Garner,

471 U.S. 1, 11 (1985)).  The incident must be viewed from the "perspective of a

reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and allow

for the fact that police officers must often make split-second decisions in tense and

rapidly-evolving situations.  Id.  The inquiry is objective, "without regard to [the

officer's] underlying intent or motivation."  Graham, 490 U.S. at 397.  Each distinct

application of force must be analyzed separately.  E.g., Blazek v. City of Iowa City, 761

F.3d 920, 923 (8th Cir. 2014).

Here, the officers used deadly force twice: Krech and Ofsted first fired at Mark

when he burst from Room 217, and they fired again, joined by Bauer, when Mark was

lying on the balcony.  In the Court's view, taking the record in a light most favorable to

Tawana, no jury could conclude either application of force was objectively unreasonable.

###### a.    The first shooting

Prior to their initial use of force, the officers had limited information.  They knew

two males had argued over a knife in the area, which prompted an emergency call.  They

also knew a black male in Room 217 possessed a gun, had threatened a uniformed officer

with it, and, even though they had verbally identified themselves as police officers, had

ignored their commands to surrender.  Shortly thereafter, Krech and Ofsted stood huddled

together not far from Room 217,[7] in the middle of the night, when the door flew open and

a gunshot rang out.  They simultaneously encountered Mark, who ran at them from the

room despite their immediate commands to "get on the ground" and "get down."  (Krech

Dep. 53–54; Ofsted Dep. 27.)  Krech and Ofsted testified they believed he possessed a

gun and had shot at them.  (Krech Dep. 56, 64; Ofsted Dep. 75.)  With him rapidly

closing in and ignoring their commands to halt, the officers opened fire only "seconds"

after he exited the room.  In the Court's view, under these tense and rapidly-evolving

circumstances, it was reasonable for the officers to perceive Mark as a serious threat.[8]

Accordingly, their use of deadly force in response was justified, and they are entitled to

qualified immunity.  Loch, 689 F.3d at 965; see also Malone v. Hinman, No. 15-3465,

slip op. at 7–8 (8th Cir. Feb. 7, 2017) (affirming grant of qualified immunity to officer

who shot armed suspect without warning after suspect ignored commands and ran toward

---

[7] The Court has been unable to locate testimony in the record regarding the distance between the breezeway and Room 217.  From photographs, the distance appears to be 20–30 feet.  (See Madia Decl. Ex. 23 at DEF 2066–67.)

[8] Both officers facing these circumstances independently reached the same conclusion, lending reasonableness to it.  See Ngo v. Storlie, Civ. No. 03-3376, 2006 WL 1579873, at *5 (D. Minn. June 2, 2006) (Kyle, J.), aff'd, 495 F.3d 597 (8th Cir. 2007).

other officers). That the officers' perceptions turned out to be wrong does not undermine the reasonableness of their split-second response. Loch, 689 F.3d at 966 ("An act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment."); Billingsley v. City of Omaha, 277 F.3d 990, 994–95 (8th Cir. 2002) (even where a suspect is ultimately found unarmed, "a police officer can still employ deadly force if objectively reasonable"). Were it otherwise, every erroneous application of deadly force, even if reasonable under the circumstances, would give lie to a claim under § 1983. That is clearly not the law. See, e.g., Partlow v. Stadler, 774 F.3d 497, 502–03 (8th Cir. 2014).

McLenagan v. Karnes, 27 F.3d 1002 (4th Cir. 1994), is instructive. There, a police officer sat in a waiting room with two drunk-driving arrestees. One of the arrestees surreptitiously obtained a gun, causing the officer and the other arrestee, William McLenagan, to flee the room. The first officer ran past a second officer, John Karnes, to whom she yelled, "This man has got a gun!" Id. at 1005. Karnes turned, drew his firearm, and immediately encountered McLenagan, whom he believed to be the armed arrestee. Id. Karnes shot McLenagan without warning even though McLenagan was unarmed with his hands cuffed in front of his body. The Fourth Circuit, reversing the district court, held Karnes was entitled to qualified immunity. Id. at 1006–08.

Here, as in McLenagan, the officers had "a credible warning . . . that an imminent danger exist[ed]." Id. at 1007. If anything, the threat from inside Room 217, together with Ballinger's gunshot, signaled a danger *more* imminent than in McLenagan. Additionally, Mark exited Room 217 "in full flight[,] virtually upon [the officers]. For

all [they] knew, [any] hesitation involved in giving a warning could readily cause such a

warning to be [their] last." Id. at 1007. And though they saw no weapon prior to firing,

the Constitution does not "require a police officer, in all instances, to actually detect the

presence of an object in a suspect's hands before firing on him." Id.; accord, e.g.,

Thompson v. Hubbard, 257 F.3d 896, 901 (8th Cir. 2001). Instead, courts defer to "the

split-second judgment of a trained police officer [even when] that judgment turns out to

be mistaken, particularly where inaction could have resulted in death or serious injury to

the officer and others." Id. at 1007–08. Thus, like Karnes, the officers here are entitled

to qualified immunity.

Tawana argues that a reasonable officer would have recognized the possibility of a

hostage situation in Room 217, as well as the possibility that a hostage might attempt to

escape. Yet, the record contains no facts from which a reasonable officer should have

intuited that individuals in Room 217 were being held hostage. No one advised

emergency dispatch of a hostage situation, and neither Krech nor Bauer testified they

heard or saw anyone other than a black male in Room 217. (See Krech Dep. 32.)

Moreover, even if this knowledge could be imputed to the officers, they had no reason to

identify *Mark* as a non-threatening, escaped hostage as opposed to a hostage taker

attempting to escape capture. This type of "Monday morning quarterback[ing]" has no

place in the Fourth Amendment's objective-reasonableness analysis. Schulz v. Long, 44

F.3d 643, 649 (8th Cir. 1995). The Fourth Amendment "requires only that the seizure be

objectively reasonable," as judged by the *circumstances confronting the officers*, and "not

that the officer pursue the most prudent course of conduct as judged by 20/20 hindsight

vision." Id. (quoting Cole v. Bone, 993 F.2d 1328, 1334 (8th Cir. 1993)).  The law does not require police officers to be perfect, only reasonable.  The subsequent revelation that Mark was an escaped hostage, without more, does not erode the reasonableness of the officers' split-second assessment.

Tawana emphasizes that Mark wore a *white* shirt while Ballinger wore a *dark, forest green* one, arguing this should have alerted the officers that Mark was not a threat. At best, though, Mark's white shirt indicated only that he was not Ballinger.  The officers had been advised that *two* men were fighting over a knife, and, more importantly, they knew a gun was present in Room 217.  The Court perceives no reason why, under these circumstances, Mark's shirt color should have intimated to the officers that he posed no serious threat, particularly when a gunshot accompanied his rapid exit from Room 217. Contrary to Tawana's suggestion, the law does not demand omniscience from police officers. E.g., Sallis v. Pavlak, Civ. No. 09-3614, 2010 WL 3384912, at *5 (D. Minn. Aug. 25, 2010) (Rosenbaum, J.).

Finally, Tawana asserts that the officers acted unreasonably by failing to afford Mark an opportunity to comply with their commands and by failing to warn him prior to using deadly force.  Yet, the officers testified they *did* give him an opportunity to comply. (Krech Dep. 55; Ofsted Dep. 25.)  Regardless, even if they had not, the Court is aware of no authority requiring officers, reasonably believing they are in imminent danger, to delay their response pending a suspect's potential compliance.  See Mettler v. Whitledge, 165 F.3d 1197, 1203 (8th Cir. 1999) ("No federal court has held that the Constitution forbids police officers, after being fired upon by a suspect, from returning fire."); see also

McLenagan, 27 F.3d at 1007. Indeed, the Fourth Amendment requires a warning only

where *feasible*, Garner, 471 U.S. at 11–12, and nothing about Mark's flight from Room

217 (to the sound of gunfire and not far from officers) suggests a warning was feasible

here. See Loch, 689 F.3d at 967; Estate of Morgan v. Cook, 686 F.3d 494, 497–98 (8th

Cir. 2012) (no specific warning feasible where knife-wielding suspect approached officer

from six to twelve feet away and officer's other commands put the suspect "on notice . . .

that[] escalation of the situation would result in the use of a firearm"); see also White v.

Pauly, __U.S.__, 137 S. Ct. 548 (2017) (reversing denial of qualified immunity to officer

who, without warning, shot and killed armed suspect from fifty feet away). Instead, this

"split-second judgment," made in "tense, uncertain, and rapidly evolving" circumstances,

fits comfortably within the scope of qualified immunity. Graham, 490 U.S. at 397.

        **b.**      **The second shooting**

       To be sure, the officers' second use of force presents a closer call. The

circumstances indicate that, when the officers opened fire a second time, Mark posed less

of a threat—he had been fired upon, he appeared to comply with officers' commands to

get on the ground, and he faced an additional, armed officer (Bauer). There is no

indication, however, that the officers had reason to believe their first volley of gunfire

had hit Mark. There is no evidence he showed signs of injury or called out as having

been struck. (See Krech Dep. 140 ("I don't recall seeing anything that is clearly him

being shot.").) In addition, the officers testified that he did not *fall* to the ground but went

down *deliberately*, indicating he retained control of his body and movements. (Ofsted

Dep. 32.) The officers ordered him to "show me your hands," "put your arms straight

up," and "stop or I'm going to shoot."  (Ofsted Dep. 33, 37–38; Bauer Dep. 37; Krech

Dep. 59, 63.)  It is undisputed that he failed to comply with these commands.[9]  Instead,

he pushed his chest off of the floor with his left hand and appeared to try to roll onto his

right side with his right hand obscured beneath his torso.  Krech testified that she could

not see his right hand, and she was worried it held a gun.  (Krech Dep. 66, 92 ("I'm

fearful he's going to shoot me from underneath his torso.").)  Bauer "remember[ed]

thinking he made it this far, he's going to kill us."  (Bauer Dep. 33.)  After Mark failed to

comply, Krech, Ofsted, and Bauer fired additional rounds until his right hand became

visible.  (Id. 39–40; Krech Dep. 61.)

In the Court's view, this second use of force was reasonable.  As discussed above,

the officers reasonably believed that Mark posed a threat when he exited Room 217.  He

then failed to comply with additional commands and moved to the intersection of the

balcony and the breezeway, where he was closer to the officers and had eliminated the

cover the officers previously enjoyed around the corner from Room 217.  The officers'

testimony that they could not see Mark's right hand beneath his torso stands unrebutted

and, as such, the Court perceives no intervening facts from which the officers should

have concluded the threat had subsided.

---

[9] Tawana argues that a bystander's photograph taken immediately after the shooting contradicts the officers' version of events.  (Mem. in Opp'n 4, 24–26 (citing Madia Decl. Ex. 101).)  The photo depicts Mark lying face down with his right hand straight out above his head.  Tawana asserts that "[n]one of the officers was [sic] able to explain . . . how [Mark]'s right arm ended up straight and above his head."  (Id. 26.)  She is simply incorrect—*all* of the officers explained that they saw Mark eventually bring his right hand out and, once he did so, they stopped firing.  (Bauer Dep. 39–40; Ofsted Dep. 39; Krech Dep. 93.)

> While hindsight reveals that [Mark] was [not] a threat when he was shot, officers should not be denied qualified immunity in situations where they are faced with a threat of severe injury or death and must make split-second decisions, albeit ultimately mistaken decisions, about the amount of force necessary to subdue such a threat.

Rush v. City of Lansing, 644 F. App'x 415, 423 (6th Cir. 2016); Gardner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996) (Though "[i]t may appear, in the calm aftermath, that an officer could have taken a different course,[] we do not hold the police to such a demanding standard."). The Eighth Circuit has consistently "declined to second-guess whether alternative actions by police officers 'might conceivably have been available.'" Estate of Morgan, 686 F.3d at 498 (quoting Cole, 993 F.2d at 1334). Since the officers had probable cause to believe Mark continued to pose a threat, their second use of deadly force was reasonable, and qualified immunity bars Tawana's claim.

## II.      Wrongful death and vicarious liability

Tawana has also alleged state-law claims for wrongful death and vicarious liability. The officers argue that official immunity bars these claims. In Minnesota, "[t]he official immunity doctrine provides that a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." Hayek v. City of St. Paul, 488 F.3d 1049, 1056 (8th Cir. 2007) (citing Elwood v. Cty. of Rice, 423 N.W.2d 671, 677 (Minn. 1988)). The use of deadly force by a police officer is a discretionary act for which the officers are entitled to official immunity absent a showing of willfulness or malice. Id. (citing Maras v. City of Brainerd, 502 N.W.2d 69, 77 (Minn. Ct. App. 1993)). Courts regularly determine that, where the use of force was not

objectively unreasonable, it was also not willful or malicious.  <u>Loch</u>, 689 F.3d at 968;

<u>Hayek</u>, 488 F.3d at 1056 ("Because the officers' use of deadly force was reasonable, a

reasonable fact-finder could not conclude the officers' conduct was willful or

malicious."); <u>Ivory v. City of Minneapolis</u>, Civ. No. 02-4364, 2004 WL 1765460, at \*8

(D. Minn. Aug. 4, 2004) (Tunheim, J.).  In the Court's view, the same result obtains here,

as Tawana relies exclusively on the arguments rejected above to support her contention

that the officers acted willfully or maliciously.  (<u>See</u> Mem. in Opp'n 52.)  The officers are

entitled to official immunity and, accordingly, the City of Woodbury enjoys vicarious

official immunity.  <u>Hayek</u>, 488 F.3d at 1057 (citing <u>Dokman v. Cty. of Hennepin</u>, 637

N.W.2d 286, 297 (Minn. Ct. App. 2001)).

## CONCLUSION

The facts of this case are undeniably tragic, and the Court is sympathetic to the

loss Tawana and all of Mark's family have sustained.  But the narrow question before the

Court is whether the officers acted reasonably.  In the Court's view, the evidence points

to only one answer:  Yes.  Accordingly, and based on all the files, records, and

proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment

(Doc. No. 72) is **GRANTED** and Plaintiff's Complaint (Doc. No. 1) is **DISMISSED**

**WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  February 9, 2017                                  s/Richard H. Kyle
                                                         RICHARD H. KYLE
                                                         United States District Judge